**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MOST REVEREND LAWRENCE E.
BRANDT, *Bishop of the Roman Catholic*
*Diocese of Greensburg, as Trustee of the*          14cv0681
*Roman Catholic Diocese of Greensburg, a*          **ELECTRONICALLY FILED**
*Charitable Trust*, ET AL.,

        Plaintiffs,

           v.

SYLVIA M. BURWELL, *In Her Official*
*Capacity as Secretary of the U.S. Department*
*of Health and Human Services*, ET AL.,

        Defendants.


**MEMORANDUM OPINION RE: PLAINTIFFS' MOTION**
**FOR A PERMANENT INJUNCTION**

**I.      Introduction**

      Within the past year, this Court has had the opportunity to consider arguments associated

with injunctions filed in two other cases brought by substantially similar Plaintiffs against the

same Government Defendants.  See *Most Reverend David A. Zubik et. al v. Secretary of the U.S.*

*Dept. of Health and Human Services, et. al.* (case no. 13cv1459) ("the *Zubik* case"), and *Most*

*Reverend Lawrence T. Persico et. al v. Secretary of the U.S. Dept. of Health and Human*

*Services, et. al.* (case no. 13cv303) ("the *Persico* case").  The instant case, like the *Zubik* and

*Persico* cases, challenges the application of the Patient Protection and Affordable Care Act

("ACA").  Specifically, the issue before this Court is whether the Diocese of Greensburg, which

is exempt from the provisions of the ACA requiring employers to provide health insurance

coverage for contraceptive products, services, and counseling ("the contraceptive mandate"), is divisible from its nonprofit, religious affiliated/related charitable and educational organizations which, under the current provisions, are compelled to facilitate/initiate coverage of contraceptive products, services, and counseling via the "accommodation."

On May 27, 2014, Plaintiffs in this case: Most Reverend Lawrence E. Brandt, Bishop of the Roman Catholic Diocese of Greensburg, as Trustee of the Roman Catholic Diocese of Greensburg, a Charitable Trust, the Roman Catholic Diocese of Greensburg as the Beneficial Owner of the Greensburg series of the Catholic Benefits Trust, Catholic Charities of the Diocese of Greensburg, and St. John the Evangelist Regional Catholic School filed a Complaint, in which they assert eight cases of action against Defendants: United States Departments of Health and Human Services ("HHS"), Labor, and the Treasury and their respective Secretaries.   On May 30, 2014, Plaintiffs filed a Motion for Expedited Preliminary Injunction, which this Court granted, thereby enjoining Defendants from enforcing the contraceptive mandate, as codified in 45 C.F.R. 147.130(a)(1)(iv).  See doc. nos. 16, 27.  The Court immediately scheduled a permanent injunction hearing.

Plaintiffs contend that the contraceptive mandate, as applied via the "accommodation," requires them to facilitate/initiate the process of providing health insurance coverage for abortion-inducing drugs, sterilization services, contraceptives, and related educational and counseling services ("contraceptive products, services and counseling").[1]

Plaintiffs allege that they must comply with the contraceptive mandate by July 1, 2014, or face substantial penalties.  See doc. no. 1, ¶ 186.  Plaintiffs also allege that their compliance with the contraceptive mandate, via the "accommodation" would require them to facilitate/initiate the

---

[1] As stated above, the Diocese of Greensburg – like all other Roman Catholic Dioceses – as a "religious employer," is exempt from the contraceptive mandate.

process through which contraceptive products, services, and counseling would be provided to their employees and thereby violate their fundamental religious rights and liberties in violation of the Religious Freedom Restoration Act ("RFRA") and the First Amendment to the United States Constitution.

Having previously issued a preliminary injunction in this case (as well as preliminary and permanent injunctions in the prior two issue-identical cases, which involved similar facts – including the same religious tenets – the same excellent counsel, the same causes of action advanced against the same Defendants, the same legal tests, and having heard the substantially same arguments from the Parties), this Court will endeavor to adopt by reference substantial, relevant portions its prior *Zubik* and *Persico* Opinions, when appropriate, for brevity and consistency.

After careful consideration of the Plaintiffs' request for a permanent injunction, the Parties' submissions, the testimony presented during an evidentiary hearing, the hearing exhibits, and the Parties' oral arguments, the Court will issue a permanent injunction for the reasons more fully set forth herein.

## II.    Findings of Fact [2]

### A.  Plaintiffs

Plaintiffs in this case are: (1) Reverend Lawrence E. Brandt, Bishop of the Roman Catholic Diocese of Greensburg, as Trustee of the Roman Catholic Diocese of Greensburg, a Charitable Trust ("the Bishop" or "Bishop Brandt"), (2) the Roman Catholic Diocese Of Greensburg as the Beneficial Owner of the Greensburg series of the Catholic Benefits Trust (the

---

[2] Unless otherwise indicated, these Findings of Fact are based upon credibility determinations the Court has made based upon the Court's observation of the witnesses' and their testimony.

"Diocese" or " the Diocese of Greensburg"), (3) Catholic Charities Of The Diocese Of Greensburg ("Catholic Charities"), and (4) St. John the Evangelist Regional Catholic School ("St. John's School").

Plaintiffs are inter-related through their affiliation with the Roman Catholic Church and their sincerely-held religious beliefs and mission.  Bishop Brandt is the spiritual leader of the Diocese of Greensburg and is responsible for the spiritual, charitable, and educational arms of that Diocese.  Catholic Charities is a nonprofit corporation affiliated with the Diocese of Greensburg with a principal place of administration in Greensburg, Pennsylvania.  St. John's School is a nonprofit corporation affiliated with the Diocese of Greensburg with a principal place of business in Uniontown, Pennsylvania.  The Diocese of Greensburg, Catholic Charities, and St. John's School are organized exclusively for the charitable, religious and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.  Doc. no. 1, ¶¶ 9-12.

**B.  Plaintiffs' Irreparable Injury**

    **1.  Injury to the Diocese**

The Parties filed "Stipulations to Undisputed Fact" and "An Additional Stipulation to Undisputed Fact," all of which the Court accepts as true and incorporates as part of its own factual findings.  See doc. nos. 22, 29.  The first undisputed and relevant fact is the Diocese of Greensburg provides health insurance coverage to the employees of its nonprofit, religious affiliated/related entities (such as Catholic Charities and St. John's School), which are directed by the Diocese to implement the spiritual, charitable, and education mission of the Diocese.

Based up on the credible testimony of Bishop Brandt, as Trustee for the Plaintiff nonprofit, religious affiliated/related organizations, the practical results of the application of the

contraceptive mandate, via the "accommodation," would be that the Diocese would be required to either:

(a) provide its nonprofit, religious affiliated/related organizations with a separate insurance policy that covers contraceptive products, services, and counseling (which the Diocese refuses to do, according to the hearing testimony) (doc. no. 1, ¶ 117-119, 126, 132, 168); or (b) decline to continue offering health coverage to their nonprofit, religious affiliated/related organizations, which would force the nonprofit, religious affiliated/related organizations to enter into their own arrangements with a health insurance provider that would arrange no-cost coverage of contraceptive products, services, and counseling.  Hearing Testimony, Bishop Brandt, doc. no. 40, pg. 43-44; Barbara Sabo, doc. no. 40, p. 58-59.

Simply stated, the Court finds that the contraceptive mandate would be unequally applied to Plaintiffs and would result in a division between the Dioceses and their nonprofit, religious affiliated/related spiritual/charitable/educational organizations that fulfill portions of the Diocese's mission.

### 2. Injury as to Nonprofit, Religious Affiliated/Related Organizations

Based upon the credible testimony of Monsignor Raymond E. Riffle (Managing Director of Catholic Charities of the Diocese of Greensburg) and Christine Roskovensky (Principal of St. John's School), their respective declarations, and the Stipulations of the Parties (doc. nos. 22 and 29), the nonprofit, religious affiliated/related organizations expelled from a Diocese's health plan would be forced to choose one of the following courses of action:

(a) purchase health insurance coverage that includes contraceptive products, services, and counseling which would violate Catholic Charities' and St. John's School's sincerely-held

religious beliefs, according to the trial testimony. Cardinal Dolan Deposition[3] pg. 25, lines 15-19, 23-25, pg, 26, lines 1-12;

(b) provide a self-certification to their third-party administrator ("TPA"), thus facilitating/initiating the process by which the TPA will obtain coverage for the contraceptive products, services, and counseling for the organizations' employees ("the accommodation"[4]) which the Bishop would refuse to permit.  Plaintiffs' Exhibit 10 "Self- Certification Form"; doc. no. 1 ¶ 151;

(c) drop health insurance coverage for employees (*i.e.*, fail to offer "full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan") (*i.e.*, comprehensive coverage)), and be subject to annual fines of $2,000 per full-time employee.  *See* 26 U.S.C. § 4980H(a), (c)(1); or

(d) purchase health insurance coverage for full-time employees without contraceptive products, services, and counseling, and potentially be subject to a tax penalty of $100 per day per affected beneficiary.[5]  *See* 26 U.S.C. § 4980D(b); and Doc. no. 1, ¶ 170.

Any of these courses of action would harm the Diocese and their nonprofit, religious affiliated/related charitable and educational organizations.  Potential effects of imposition of fines include: decreased donations, loss of employees to other employers, loss of services, and

---

[3] Cardinal Dolan's testimony was presented (and admitted into evidence) at the July 18, 2014 injunction hearing via deposition transcript which had been recorded on November 7, 2013, in New York City, New York in connection with the *Zubik* and *Persico* cases.  See Plaintiffs' Exhibit 1, doc. no. 39-1.

[4] Per the "accommodation," the organization must self-certify that it: (1) "opposes providing coverage for some or all of [the] contraceptive services"; (2) is "organized and operates as a nonprofit entity"; and (3) "holds itself out as a religious organization." The organization must then provide a signed self-certification to its insurance company, or if self-insured, to its TPA. 26 CFR § 54.9815-2713A(a).

[5] In the *Zubik*  and *Persico* cases, the Parties stipulated that "it is not possible to determine the exact amount of tax Plaintiffs could be assessed under this penalty." *Persico,* 13-cv-303, doc. no. 58; *Zubik*, 13-cv-1459, doc. no. 59.

such fines may "close [the organizations'] doors, denying thousands in the local community its charitable services." Declaration of Monsignor Riffle (Plaintiffs' Exhibit 22), ¶¶ 35-36; Declaration of Christine Roskovensky (Plaintiffs' Exhibit 23), ¶¶ 26-27.   During the Injunction Hearing, credible testimony was presented that fines related to the contraceptive mandate will compel Plaintiff nonprofit, religious affiliated/related organizations to limit services or close. Hearing Testimony, Bishop Brandt, pg. 44; Monsignor Riffle, pg. 85.

Currently, Plaintiffs are experiencing and may continue to experience increased administrative burdens, lost personnel hours, and the fear of increased insurance premiums. Deposition of Cardinal Timothy Michael Dolan (Plaintiff's Exhibit 1), pg. 40, lines 22-25, pg. 41, 1-7.

Failure to comply with the contraceptive mandate would also expose the organizations, and ultimately the Diocese, to civil actions by ERISA-covered plan participants for unpaid benefits, and enforcement actions by the Secretary of Labor.  *See* 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(5), and 1132(b)(3).  The Secretary of HHS may impose a civil monetary penalty for failure to provide certain required coverage.  42 U.S.C. § 300gg-22(b)(2)(C)(i).  Failure to pay levied fines would subject Plaintiffs to additional fines and potential property liens.  *See* 26 U.S.C. §§ 6321, 6672.

**C.  The Organization and Religious Mission of the Diocese**

**1.  Organization of the Diocese**

Bishop Brandt, in in his capacity as Bishop and Trustee of the Diocese of Greensburg, manages 78 parishes and their charitable trusts.  Doc. no. 1, ¶ 24.  The Diocese provides services throughout four counties in Southwestern Pennsylvania – Armstrong, Fayette, Indiana, and Westmoreland – including a Catholic population of approximately 153,000 people.  Id.  Bishop

Brandt oversees the "multifaceted" mission of spiritual, educational, and social service to
residents of the Diocese and specifically oversees the mission of social service in his role as
Chairman of the Membership Board of Catholic Charities.  Id.

### 2.   Religious Mission of the Diocese includes Good Works

Plaintiffs sincerely believe that religious worship, faith, and good works are essential and
integral components of the Catholic faith and constitute the core mission of the Catholic Church.
Hearing testimony of Bishop Brandt, p. 23 (". . .the service of charity in the [C]hurch is a
constitutive element of the [C]hurch's mission.").

"The Church's deepest nature is expressed in her three-fold responsibility: of proclaiming
the word of God (kerygma-martyria), celebrating the sacraments (leitourgia), and exercising the
ministry of charity (diakonia).  These duties presuppose each other and are inseparable."
Plaintiff's Exhibit 4, "Apostolic Letter Issued 'Motu Proprio' on the Supreme Pontiff Benedict
XVI on the Service of Charity," pg. 1; and Plaintiff's Exhibit 1, Cardinal Dolan Deposition, pg.
36, lines 1-36, pg. 38, lines 11-13 ("That's your daily life. That's everything we do, dream,
believe, breathe, wake, sleep, is our – is our faith.").

### D.   Nonprofit Religious Affiliated/Related Organizations Charitable and Educational Organizations of the Diocese

### 1.   Role of the Bishop in the Organizations

As the head of the Diocese of Greensburg, Bishop Brandt carries out the "good works" of
the Catholic Church through: educating children regardless of their religion, promoting spiritual
growth (including conducting religious services, operating seminaries, and hosting religious
orders), and providing community service to others regardless of the recipient's religion or other
factors.  Doc. No. 1, ¶ 24-26; Plaintiffs' Exhibit 25, ¶ 2.  "[T]he Bishops, as successors of the

Apostles, are charged with primary responsibility for carrying out in the particular Churches the service of charity[]; . . . [T]he duty of charity [is] a responsibility incumbent upon the whole Church and upon each Bishop in his Diocese . . . ." Plaintiffs' Exhibit 4, pg. 1.  Bishops have a duty to prevent parishes and "diocesan structures" from taking actions at odds with the Church's teachings.  Plaintiffs' Exhibit 4, Article 9, § 3 ("It is the duty of the diocesan Bishop and the respective parish priests to see that in this area the faithful are not led into error or misunderstanding; hence they are to prevent publicity being given through parish or diocesan structures to initiatives which, while presenting themselves as charitable, propose choices or methods at odds with the Church's teaching.").  Bishops are also responsible for "ensur[ing] that in the activities and management of these activities, the norms of the Church's universal, and particular law are respected, as well as the intentions of the faithful who made donations or bequests for these specific purposes."  Plaintiffs' Exhibit 4, Article 4, § 3.

### 2.  Catholic Schools

Education is an integral component of the Catholic faith.  Doc. no. 1, ¶ 26.  Hearing testimony, Bishop Brandt, pg. 26 ("[The Church operates these Catholic schools] [b]ecause there again, it's part of our mission, our mission to teach.")

The Diocese of Greensburg runs, organizes, and supervises approximately two high schools, two junior high schools , thirteen elementary schools, and various preschool programs. Doc. no. 1, ¶ 26.  These schools educate approximately 2,800 students.  Id.  These schools are open to and serve all children, without regard to the students' religion, race, or financial condition.  Doc. no. 1, ¶ 27.

The elementary schools within the Diocese are not exclusive to Catholics, and approximately 60 percent of the students at Holy Trinity School identify themselves as non-

Catholic and 40 percent of the students at Conn-Area Catholic School and the Cardinal Madia Academy identify themselves as non-Catholic.  Doc. no. 1 ¶ 29.  The contraceptive mandate, as applied via the "accommodation" and the "exemption," will result in elementary schools within the Diocese being treated differently – certain elementary schools within the Diocese will be exempt from compliance with the regulations, while others will not.  Doc. no. 1, ¶ 30.

St. John's School is a Catholic elementary school in Uniontown, Pennsylvania that offers education for preschool through eighth grade. Doc. no. 1, ¶ 68.  The "primary purpose" of St. John's School is to provide a school environment based on the values of the Catholic faith and "is an extension of the Diocese of Greensburg in educating and reinforcing the Catholic faith." Plaintiffs' Exhibit 23, Declaration of Christine Roskovensky, ¶ 7.   Theology classes are held daily and are part of the age-appropriate curriculum in all grades at St. John's School.  Id. Students participate in: daily prayer, seasonal devotions, sacramental preparations, Mass, service projects throughout the school year, which are also important parts of the Catholic curriculum provided by St. John's School.  Id., ¶¶ 8-9.

St. John's School is a charitable trust affiliated with the Diocese of Greensburg and its employees are insured under the Diocesan health plan.  Doc. no. 1, ¶¶ 75, 77.  The Bishop, in his role as trustee of St. John's School, and the Diocese directly oversee the governance of St John's School.  Doc. no. 1, ¶ 77.  St. John's School is not exempt from the contraceptive mandate because it is not an "integrated auxiliary" under the definition in 26 C.F.R. § 1.6033-2(h), and thus, does not qualify as a "religious employer" under the exemption to the contraceptive mandate.  Doc. no. 1, ¶ 76.

### 3.  Social Service Organizations

Providing social services to others is a central tenet of the Catholic faith.  Hearing Testimony, Monsignor Riffle, pg. 64-65, lines 24-25, 1-10.   These "good works" are integral to the practice of the Catholic faith.  Hearing Testimony, Bishop Brandt, pg. 10-11 (" . . . we are charged to have the faith and then to take that faith out of the church and live it by translating it into good works, into service for others; not just for Catholics, but also for everyone.").  Organizations that  provide social services must be provided in conformity with the Catholic faith.  Hearing Testimony, Bishop Brandt, pg. 21-22, lines 19-4 ("These organizations must be administered consistent with the tenets of the Catholic Church.").

Consistent with the tenet of providing social services to the community at large, Catholic Charities is the primary social service agency of the Diocese of Greensburg and provides social services to the residents of its four-county community.   Hearing Testimony, Monsignor Riffle, pg. 65, lines 13-16.   These services are provided without regard to national origin, race, color, sex, religion, age, or disability.  Id.  Catholic Charities provides counseling services, adoption services, foster care services, and material assistance, among other services to the community.  Hearing Testimony, Monsignor Riffle, pg. 65, lines 19-23.  The material assistance services respond to about 180 telephone calls per day for food, clothing, diapers, shelter, and fuel for both for automobile and home.  Hearing Testimony, Monsignor Riffle, pg. 66-67, lines 21-25, 1-3.  Catholic Charities assists thousands of people annually.  Hearing Testimony, Monsignor Riffle, pg. 67, lines 17-19.

**E. Plaintiffs' Employee Health Insurance Coverage**

**1. Religious Components of Employee Health Care**

The sanctity of human life from conception to natural death and the dignity of all persons are central tenets of the Catechism of the Catholic Church.  Hearing Testimony, Bishop Brandt, pg. 10, lines 13-17.  The Catholic Church believes that health care is a basic right because of the sanctity and dignity of human life.  See Cardinal Dolan Deposition (Plaintiffs' Exhibit 1, doc. no. 39-1), pg. 28, lines 19-23; Hearing Testimony, Bishop Brandt, pg. 27, lines 10-18.

The Catholic Church also believes that contraception and abortion are prohibited, and Catholics cannot facilitate/initiate, directly or indirectly, the provision of abortions.  Cardinal Dolan Deposition (Plaintiffs' Exhibit 1, doc. no. 39-1), pg. 12, lines 11-16 (Abortion-inducing drugs, sterilization and contraceptives "are intrinsically evil."); Plaintiffs' Exhibit 3, "Ethical and Religious Directives for Catholic Health Care Services, United States Conference of Catholic Bishops November 17, 2009," ¶¶ 45, 52 ("Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted.  Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implementation of the embryo.  Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation.  In this context, Catholic health care institutions need to be concerned about the danger of scandal[6] in any association with abortion providers.").

This belief necessarily prohibits providing, subsidizing, initiating, or facilitating insurance coverage for abortion-inducing drugs, sterilization services, contraceptives, and related

---

[6] Per testimony, "scandal," within the Catholic faith, means cooperating with an objectionable practice that goes against the faith, or "teaching one thing and behaving in another manner."  Hearing Testimony, Bishop Brandt, pg. 35, lines 20-23.

educational and counseling services.  Declaration of Monsignor Larry Kulick, doc. no. 17-3, ¶¶ 12-16 ("One outgrowth of belief in human life and dignity is Plaintiffs' well-established belief that "[h]uman life must be respected and protected absolutely from the moment of conception . . . ." Furthermore, Plaintiffs adhere to Catholic teachings that prohibit any action which "render[s] procreation impossible" and which, more specifically, regard direct sterilization as "unacceptable."); Plaintiffs' Exhibit 3, doc. no. 39-3, pg. 28, ¶ 52 ("Catholic health institutions may not promote or condone contraceptive practices but should provide, for married couples and the medical staff who counsel them, instruction both about the Church's teaching on responsible parenthood and in the methods of natural family planning.").

### 2.   Diocese of Greensburg and the Catholic Benefits Trust

The Diocese of Greensburg operates a self-insured health plan through the insurance obtained through the Catholic Benefits Trust ("Trust").  Complaint, doc. no. 1, ¶ 33; and Stipulation to Undisputed Facts, doc. no. 22, ¶ 1.  The Trust was formed in June 2013 by an agreement between the Diocese of Greensburg, the Diocese of Altoona-Johnstown, and the Diocese of Pittsburgh (the "Trust Agreement"), in an effort to pool resources with regard to health benefits.  Id.  The Trust was formed by the Diocese of Pittsburgh converting its Catholic Employers Benefits Plan Delaware Trust to a Delaware statutory trust and expanding the Trust to include the Dioceses of Altoona-Johnstown and Greensburg.  Id.

The three Dioceses are the Beneficial Owners of the Trust, which is split into three series: the Greensburg series, the Altoona-Johnstown series, and the Pittsburgh series.  Complaint, doc. no. 1, ¶ 34; Stipulation to Undisputed Facts, doc. no. 22, ¶1.  Each Diocese is the sole "Beneficial Owner" and sole beneficiary of its respective series.  Id.  Thus, Plaintiff Diocese of

Greensburg  is the sole Beneficial Owner and sole beneficiary of the Greensburg series of the Trust.  Id.

The Trust functions as the insurance company underwriting the covered employees' medical costs with all funding coming from each respective Diocese and its covered affiliates. Complaint, doc. no. 1, ¶ 36; Stipulation to Undisputed Facts, doc. no. 22, ¶ 1.  Approximately 600 employees at the Diocese of Greensburg and its "various related affiliated entities" are eligible for health coverage through the Trust.  Complaint, doc. no. 1, ¶ 39; Stipulation to Undisputed Facts, doc. no. 22, ¶ 1.  Of those 600 employees, approximately 400 employees participate and thus, the total number covered by the Trust plan amounts to 800 – when dependants of covered employees are included in the count.  Id.

The health care plan offered through the Catholic Benefits Trust is administered by TPAs.  Complaint, doc. no. 1, ¶ 37; Stipulation to Undisputed Facts, doc. no. 22, ¶ 1. The Trust offers two health plan options ("lay basic" and "lay premium") for the employees of the Diocese of Greensburg itself, Catholic Charities, and all other Diocesan-affiliated entities within the Diocese such as St. John's School.   Complaint, doc. no. 1, ¶¶ 38, 41; Declaration of Charles Quiggle[7], doc. no. 17-6, ¶ 6; Stipulation to Undisputed Facts, doc. no. 22, ¶ 1.

Consistent with the teachings of the Catholic Church, all of the Diocesan employee health plan and prescription options offered through the Trust, including those for its nonprofit, religious affiliated/related organizations, such as Catholic Charities, do not include coverage for abortion-inducing drugs, contraceptives, or sterilization, except when medically necessary. Declaration of Charles Quiggle, doc. no. 17-6, ¶ 9; Stipulation to Undisputed Facts, doc. no. 22, ¶ 1.

---

[7] Mr. Quiggle is the Director of Human Services for the Diocese of Greensburg, and has been since August 28, 2000.

14

The Diocesan health plans offered to lay employees of the Diocese and lay employees of its affiliates (such as Catholic Charities and St. John's School), are not "grandfathered" and therefore, do not meet the ACA's definition of a "grandfathered" plan.[8]  Declaration of Charles Quiggle, doc. no. 17-6, ¶ 10; Stipulation to Undisputed Facts, doc. no. 22, ¶ 1.  The next plan year for these health care plans began on July 1, 2014, and if this Court had not entered the Preliminary Injunction, Plaintiffs would have to have been prepared to comply with the regulations including the contraceptive mandate.  Complaint, doc. no. 1, ¶ 40; Declaration of Charles Quiggle, doc. no. 17-6, ¶¶ 11, 13; Stipulation to Undisputed Facts, doc. no. 22, ¶ 1.

### 3.   Trust Agreement – See doc. no. 1, ¶¶ 46-49 and doc. no. 22, ¶ 1.

The Trust Agreement provides that "each Director" of the Board of Directors of the Trust shall be "appointed by the Bishop of each Diocese that is or becomes a Beneficial Owner" of the Trust.  The Board of Directors is then responsible for "[t]he management of the Trust[.]"  Thus, the Bishop is required to appoint a Director to the Board of the Trust with the knowledge that,

---

[8] As noted previously in the *Zubik* and *Persico* matters:

> The distinction between plans that are "grandfathered" and those that are not is important because as defined in federal regulations, plans that are "grandfathered" do not have to provide coverage without cost sharing of "preventive health services." 45 C.F.R. § 147.140; 26 C.F.R. § 54.9815-125T; and 29 C.F.R. § 2590.7151251.  A plan is "grandfathered" if: (1) at least one person was enrolled on March 23, 2010; (2) the plan continuously covered at least one individual since that date; (3) the plan provides annual notice of its grandfathered status; and (4) the plan has not been subject to significant changes as outlined in the regulations.  See 42 U.S.C. § 18011; 26 C.F.R. §§54.9815-1251T(a), (g); 29 C.F.R. §§ 2590.715-1251(a), (g); 45 C.F.R. §§147.140(a)(g).  A plan may maintain its grandfathered status so long as, if, compared to its existence on March 23, 2010, it does not: eliminate all or substantially all benefits to diagnose or treat a particular condition; increase a percentage cost-sharing requirement; significantly increase a fixed-amount cost-sharing requirement; significantly reduce the employer's contribution; or impose or tighten an annual limit on the dollar value of any benefits.  Additional Stipulated Facts, ¶ 3, citing 26 C.F.R. § 54.9815-1251T(a), (g)(1); 29 C.F.R. § 2590.715-1251(a), (g)(1); 45 C.F.R. § 147.140(a), (g)(1).

See doc. no. 75 in *Persico,* case no. 13cv303, page 25, fn 16; doc. no. 75 in *Zubik*, case no. 13-cv-1459, page 25, fn 16.

under the contraceptive mandate, the Director must then allow the Trust directly to facilitate provision of the objectionable services for accommodated entities.  The Bishop knows that his appointee will be forced to violate the Catholic faith.

While "all powers to manage the business and affairs of the Trust and each Series shall be exclusively vested in the Board and the Board may exercise all powers of the Trust[,]" "a majority of the Beneficial Owners may amend [the Trust] Agreement in writing at any time and thereby broaden or limit the Board's power and authority[.]"  Accordingly, while the Board of Directors manages the daily affairs of the Trust, the Dioceses through their respective Bishops have ultimate decision-making authority and ultimately are forced directly to facilitate provision of the objectionable services to the employees of accommodated entities within the Trust.

The Diocese, as operator and sole Beneficial Owner of the Greensburg series of the Trust, decides whether an entity may continue to participate in the Trust.  The Trust Agreement provides that "[e]ach Beneficial Owner may allow such Diocesan Entities to benefit in such Series in respect of which such Beneficial Owner is the holder of the sole interest in accordance with the terms and conditions established by such Beneficial Owner in consultation with its advisors."

Because accommodated, non-grandfathered entities, like Plaintiff Catholic Charities and Plaintiff St. John School, currently participate in the Trust, the Diocese will directly facilitate coverage of the objectionable services for the employees of these accommodated entities if the Diocese permits these entities to continue to participate in the Trust.  Thus, the Diocese now faces the decision of whether to expel these accommodated entities – *i.e.,* Catholic Charities and St. John's School – from the Trust.

The Diocese, as sole beneficial owner, also is responsible for any fines incurred by accommodated entities like Catholic Charities and St. John's School as a result of non-compliance with the contraceptive mandate.  Under the Trust Agreement, "[a] particular Series shall be charged with the liabilities of that Series, and all expenses, costs, charges and reserves attributable to any particular Series shall be borne by such Series."

### F.  Plaintiffs' Religious Beliefs as to the Contraceptive Mandate

As previously noted, a tenet of the Catholic faith is the belief that human life must be preserved from conception through natural death.  See generally Hearing Testimony, Bishop Brandt, pg. 10, lines 10-17; pg. 12, lines 11-24.

The ACA includes the provision that eight categories of preventative services for women must generally be covered by group health plans without cost sharing.  Plaintiff's Exhibit 67, HRSA, *Women's Preventive Services Guidelines* (Aug. 1, 2011), available at http://www.hrsa.gov/womensguidelines.  Plaintiffs only object to the category that includes "contraceptive methods and counseling," which covers FDA approved "contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," claiming the "contraceptive methods and counseling" category which provides for such products, services, and counseling, violates their belief in the sanctity of human life.  See generally Hearing Testimony, Bishop Brandt, pg. 10, lines 10-17; pg. 12, lines 11-24; pg. 16, 4-8.

Completing the self-certification form required by the contraceptive mandate's "accommodation" also violates that tenet.  Hearing Testimony, Bishop Brandt, pg. 35, lines 5-7 ("If I sign the self-certification form, automatically that triggers the TPAs being able to offer those preventive services to which we object and which we find immoral.") (emphasis added).

17

Bishop Brandt indicated that he would not sign the self-certification form as it would burden his and any other signer's exercise of religion.  Hearing Testimony, Bishop Brandt, pg. 36, lines 6-18 (<u>Signing the form "involves material cooperation in conduct which is intrinsically evil."</u>) (emphasis added); and pg. 37, lines 16-17 (". . . <u>I cannot sign that document, the self-certification document, because that is cooperating in moral evil.</u>") (emphasis added).

In explaining the burden that signing the self-certification form places upon him and those who would have to sign on behalf of Catholic Charities and St. John's School, Bishop Brandt explained that although the "<u>self[-]certification form may take only a few minutes to sign, it's ramifications are eternal because it constitutes direct facilitation of moral evil.</u>"  Declaration of Bishop Brandt, doc. no. 17-7, ¶ 17 (emphasis added); Stipulation to Undisputed Facts, doc. no. 22, ¶ 1.  During the injunction hearing, Bishop Brandt expounded on his declaration stating, ". . . <u>it's not how long the signature takes that's important for us.  It is what the signature triggers, the ramifications, the consequences that come from the signature.</u>"  Hearing Testimony, Bishop Brandt, pg. 40, lines 22-25 (emphasis added).


## III.    Statutory and Regulatory History[9]

### A.  Introduction

In March 2010, Congress enacted the ACA. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

The ACA established new requirements for "group health plan[s]," broadly defined as "employee welfare benefit plan[s]" within the meaning of the Employee Retirement Income

---

[9] This section is identical to the Section III filed in *Zubik* and *Persico* cases (case nos. 13cv303 and 13-1459, respectively) at doc. no. 75, pages 29-38.  The parties have not referenced any new statute and/or regulation that would relate to the issue(s) presented herein.

Security Act ("ERISA"), 29 U.S.C. § 1002(1), that "provide[] medical care . . . to employees or their dependents." 42 U.S.C. § 300gg-91(a)(1).

Section 1001 of the ACA requires all group health plans and health insurance issuers that offer non-grandfathered, non-exempt group or individual health coverage to provide coverage forcertain preventive services without cost-sharing, including, "[for] women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [("HRSA")]." 42 U.S.C. § 300gg-13(a)(4). The ACA provides that certain of its provisions apply to "grandfathered health plans" and certain of its provisions, including 42 U.S.C. § 300gg-13, do not apply to "grandfathered health plans." 42 U.S.C. § 18011. The contraceptive mandate does not apply to qualifying "grandfathered" plans, and such plans are not required to comply with the preventive services coverage requirement of 42 U.S.C. § 300gg-13.

**B.  Regulatory Background**

**1.  Rulemaking from July 2010 to March 2012**

On July 19, 2010, Defendants issued interim final rules, incorporating the statutory requirement that group health plans provide coverage for women's "preventive care."  75 Fed. Reg. 41,726 (citing 42 U.S.C. § 300gg-13(a)(4)).  These initial rules did not define "preventive care," noting that "[t]he Department of HHS is developing these guidelines and expects to issue them no later than August 1, 2011."  Id. at 41,731.  At that time, there were no existing HRSA guidelines relating to preventive care and screening for women.

The Department of Health and Human Services ("HHS") tasked the Institute of Medicine ("IOM"), a non-governmental organization, with "review[ing] what preventive services are necessary for women's health and well-being and should be considered in the development of

19

comprehensive guidelines for preventive services for women." IOM Report at 2. On July 19, 2011, the IOM Committee released a report entitled "Clinical Preventive Services for Women: Closing the Gaps 19-20, 109 (2011) ("IOM Report"). The IOM Report recommended that the HRSA guidelines include, among other things, "the full range of [FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity" ("Preventive Services"). IOM Report at 10-12. FDA-approved contraceptive methods include diaphragms, oral contraceptive pills, emergency contraceptives (such as Plan B and Ella), and intrauterine devices ("IUDs"). See id. at 105. The IOM Report included a dissent from Committee member Anthony Lo Sasso.

On August 1, 2011, HHS issued a press release announcing that it would adopt the recommendations of the IOM Report. U.S. Dept. of Health and Human Services, "Affordable Care Act Ensures Women Receive Preventive Services at No Additional Cost," *available at* http://www.hhs.gov/news/press/2011pres/08/20110801b.html.

Also, on August 1, 2011, HRSA adopted guidelines consistent with IOM's recommendations, encompassing all FDA-approved "contraceptive methods, sterilization procedures, and patient education and counseling," as prescribed by a health care provider, subject to an exemption relating to certain religious employers authorized by regulations issued that same day (the "2011 amended interim final regulations"). See HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines ("HRSA Guidelines").

In August 2011, the Government issued interim final rules implementing the statutory requirement that group health plans provide coverage for women's "preventive care and screenings . . . as provided for in comprehensive guidelines supported by [HRSA]." 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011).

The August 2011 interim final rules also amended the July 19, 2010 interim rules to provide HRSA additional discretion to exempt "religious employers" from the contraceptive coverage requirement. Id. To qualify for the religious employer exemption contained in the 2011 amended interim final regulations, an employer had to meet the following criteria:

a. The inculcation of religious values is the purpose of the organization;

b. The organization primarily employs persons who share the religious tenets of the organization;

c. The organization serves primarily persons who share the religious tenets of the organization; and

d. The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended [*i.e.*, an organization exempted from filing IRS Form 990].

Id. at 46,623.  The Government sought "to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions." Id.

In February 2012, the Government "finalize[d], without change," the "religious employer" exemption as originally proposed in the August 2011 interim final rules.  77 Fed. Reg. at 8,729 (Feb. 15, 2012).  In February 2012, the Government also created a "one-year safe harbor from enforcement" for non-grandfathered group health plans sponsored by certain nonprofit organizations with religious objections to contraceptive coverage.  See 77 Fed. Reg. 8725, 8726-28 (Feb. 15, 2012).  The Government undertook a new rulemaking during the safe harbor period to adopt new regulations applicable to non-grandfathered nonprofit religious organizations with religious objections to covering Preventive Services.  Id. at 8728.

21

On March 21, 2012, the Government issued an Advance Notice of Proposed Rulemaking ("ANPRM") that stated it was part of the Government's effort "to develop alternative ways of providing contraceptive coverage without cost sharing in order to accommodate non-exempt, nonprofit religious organizations with religious objections to such coverage." 77 Fed. Reg. 16,501, 16,503 (Mar. 21, 2012).

### 2.   Rulemaking from February to July 2013

On February 1, 2013, the Government issued a Notice of Proposed Rulemaking ("NPRM"), setting forth a proposal that stated it was to "amend the criteria for the religious employer exemption to ensure that an otherwise exempt employer plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths," and to "establish accommodations for health coverage established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education, with religious objections to contraceptive coverage."  See 78 Fed. Reg. 8456 (Feb. 6, 2013).

Defendants received over 400,000 comments (many of them standardized form letters) in response to the proposals set forth in the NPRM.  78 Fed. Reg. 39,870, 39,872 (July 2, 2013).

On June 28, 2013, the Government issued final rules adopting and/or modifying proposals in the NPRM.  See 78 Fed. Reg. 39,870 ("Final Rule").  The regulations challenged here (the "2013 final rules") include the new regulations issued by the Government and applicable to non-grandfathered, nonprofit religious organizations with religious objections to covering Preventive Services.  See 78 Fed. Reg. 39,870; see also 77 Fed. Reg. 16,501 (ANPRM); 78 Fed. Reg. 8456 (NPRM).

### a.   The 2013 Final Rules' "Religious Employer" Exemption

The Final Rule states that it "simplify[ied] and clarify[ied] the definition of "religious employer." 78 Fed. Reg. at 39,871.  Under the new definition, an exempt "religious employer" is "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."  78 Fed. Reg. 39874 (codified at 45 CFR § 147.131(a)).  The groups that are "refer[red] to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code," are:

> (i) churches, their integrated auxiliaries, and conventions or associations of churches, and
>
>           *        *        *
>
> (iii) the exclusively religious activities of any religious order.

26 U.S.C. § 6033(a)(3)(A)(i) or (iii).  Section 6033 of the Internal Revenue Code addresses whether and when nonprofit entities that are exempt from paying taxes under the Code must file "annual information [tax] return[s]."  26 C.F.R. § 1.6033-2(a).

The new definition of "religious employer" does "not expand the universe of religious employers that qualify for the exemption beyond that which was intended in the 2012 final regulations."  78 Fed. Reg. at 39,874 (citing 78 Fed. Reg. 8461).  Entities that are included in Section 6033(a)(3)(A) are exempt from filing an annual Form 990 with the IRS.[10]

---

[10] The IRS has developed a non-exhaustive list of fourteen facts and circumstances that may be considered, in addition to "any other facts and circumstances that may bear upon the organization's claim for church status," in assessing whether an organization is a "church" under section 6033(a)(3)(A)(i) of the Internal Revenue Code.  *See Foundation of Human Understanding v. United States*, 88 Fed. Cl. 203, 220 (Fed. Cl. 2009); Internal Revenue Manual 7.26.2.2.4.   The list of fourteen facts and circumstances includes the following:

> (1) a distinct legal existence;
> (2) a recognized creed and form of worship;
> (3) a definite and distinct ecclesiastical government;
> (4) a formal code of doctrine and discipline;
> (5) a distinct religious history;
> (6) a membership not associated with any church or denomination;
> (7) an organization of ordained ministers;
> (8) ordained ministers selected after completing prescribed studies;
> (9) a literature of its own;

The 2013 final rules' amendments to the religious employer exemption apply to group health plans and group health insurance issuers for plan years beginning on or after August 1, 2013. See id. at 39,871.

### b.  The 2013 Final Rules' "Accommodation"

The 2013 final rules establish regulations regarding the contraceptive coverage requirement for group health plans established or maintained by "eligible organizations." 78 Fed. Reg. at 39,875-80; 45 C.F.R. § 147.131(b).

An "eligible organization" is an organization that satisfies the following criteria:

---

(10) established places of worship;
(11) regular congregations;
(12) regular religious services;
(13) Sunday schools for the religious instruction of the young; and
(14) schools for the preparation of its ministers.

*Id*.

In 26 C.F.R. § 1.6033-2(h), the Treasury Regulations provide a three (3) prong test to determine whether a group is an "integrated auxiliary" under section 6033(a)(3)(A)(i) of the Internal Revenue Code. According to the Treasury Regulation, the term "integrated auxiliary of a church" means an "organization that is: (i) [d]escribed in both sections 501(c)(3) and 509(a)(1), (2), or (3); (ii) [a]ffiliated with a church or a convention or association of churches; and (iii) [i]nternally supported." 26 C.F.R. § 1.6033-2(h)(1). An organization is "internally supported" for purposes of subparagraph (h)(1)(iii), above, of this section, unless it both,

(i) Offers admissions, goods, services or facilities for sale, other than on an incidental basis, to the general public (except goods, services, or facilities sold at a nominal charge or for an insubstantial portion of the cost); and

(ii) Normally receives more than 50 percent of its support from a combination of governmental sources, public solicitation of contributions, and receipts from the sale of admissions, goods, performance of services, or furnishing of facilities in activities that are not unrelated trades or businesses.

An entity's eligibility for exemption as a religious employer is determined on an employer-by-employer basis.  See 78 Fed. Reg. at 39,886.

An entity that offers a health plan to its employees that is administered by a qualified religious employer must independently qualify for the religious employer exemption to be exempt.  78 Fed. Reg. 39,886; see also 78 Fed. Reg. at 8456, 8463.

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies.

45 C.F.R. § 147.131(b); see also 78 Fed. Reg. at 39,874-75.  The 2013 final rules state that an eligible organization is not required "to contract, arrange, pay, or refer for contraceptive coverage" to which it has religious objections.  78 Fed. Reg. at 39,874.

To be relieved of the obligations that otherwise apply to non-grandfathered, non-exempt employers, the 2013 final rules require that an eligible organization complete a self-certification form, certifying that it is an eligible organization, sign the form, and provide a copy of that self-certification to its insurer or TPA.  Id. at 39,878-79.

For self-insured organizations, the self-certification "will afford the [TPA] notice of [its] obligations" under the 2013 final rules, "and will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA."  78 Fed. Reg. at 39,879.  Section 3(16) of ERISA provides the definition of "administrator" under ERISA.  29 U.S.C. § 1002(16).

Under the 2013 final rules, in the case of an eligible organization with a self-insured group health plan, the organization's TPA, upon receipt of the self-certification, will provide or arrange separate payments for contraceptive services for participants and

beneficiaries in the plan without cost-sharing, premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or its plan.  See id. at 39,879-80; 26 C.F.R. § 54.9816-2713A(b)(2), (c)(2).

Under the 2013 final rules, costs incurred by TPAs relating to the coverage of Preventive Services for employees of eligible organizations will be reimbursed through an adjustment to Federally-facilitated Exchange (FFE) user fees.  See 78 Fed. Reg. at 39,880.  The payments for Preventive Services required by the challenged regulations applicable to employer-sponsored health insurance plans are available to an employee only while the employee is on an organization's health plan.  29 C.F.R. § 2590.715-2713; 45 C.F.R. § 147.131(c)(2)(i)(B).

Self-insured religious employers and eligible organizations are prohibited from "directly or indirectly, seek[ing] to influence the[ir] third party administrator's decision" to provide or procure Preventive Services.  26 C.F.R. § 54.9815–2713.

The 2013 final rules' "accommodation" applies to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014.  See id. at 39,872.

IV.    **Summation of Findings of Fact**

Based upon testimony presented at the injunction hearing, credibility determinations of the witnesses by this Court, and the sum of evidence presented in various forms, the Court finds that:

(1) Plaintiffs hold sincerely to the religious beliefs of the Catholic faith that:

(a)    human life is sacred from conception to natural death;

    (b)    worship, faith, and good works are essential and integral to the practice of

            Catholicism ("faith without good works is dead"); and

    (c)    the facilitation of evil is as morally odious as the proliferation of evil.

    (2) Plaintiffs will refuse to provide, directly or indirectly, employee health insurance

coverage for contraceptive products, services, or counseling, because doing so would violate

their sincerely-held religious beliefs.

    (3) The nonprofit, religious affiliated/related Plaintiffs (Catholic Charities and St. John's

School) will not complete the self-certification form.  These Plaintiffs will partake in this act of

civil disobedience because to do otherwise – meaning signing the self-certification form – will

initiate ("cause a process of action to begin") and facilitate coverage of contraceptive products,

services, and counseling by a TPA or health insurer.  The act of signing the self-certification

form will violate these Plaintiffs' sincerely-held religious beliefs.  Further, Bishop Brandt will

direct these Plaintiffs not to complete the self-certification form.

    (4) The nonprofit, religious affiliated/related Plaintiffs will be subject to substantial

fines/penalties/"taxes" and other coercive governmental sanctions.[11]

---

[11]  The Government argues that it lacks "regulatory authority to require the TPAs of self-insured church plans to make separate payments for contraceptive services for participants and beneficiaries in such plans under the challenged accommodations."  Supplemental Brief, doc. no. 35, p. 1.  The Government further contended "that self-insured church plans do not fall within ERISA's ambit."  Hearing Transcript, doc. no. 40, p. 110, lines 6-7.  The Government explained that "very late in the game, we realized that the health plan that is offered through the Catholic Benefits Trust is, in fact, a self-insured church plan.  And that means that the Government lacks any regulatory authority whatsoever, statutory or regulatory, to force the TPA to provide coverage for contraceptive service."  Hearing Transcript, doc. no. 40, p. 110, lines 5-11.

As explained in greater detail, when Plaintiffs sign "the form" (EBSA Form 700) to comply with the accommodation, and send "the form" to the TPA, the TPA "becomes an ERISA  . . .  plan . . . and claims administrator for the purpose of providing the separate payments for contraceptive purposes."  Government's Brief in Opposition, doc. no. 23, p. 3.  Per the Government, Plaintiffs' TPA, once  its status was converted upon receipt of "the form" to an ERISA administrator, would be subject to the Government's (*i.e.,* the Department of Labor's) ERISA enforcement authority and thereby the contraceptive coverage requirements under ACA could be enforced.  Id.  However, the Government now

(5) The effect of the imposition of these fines/penalties/"taxes" will gravely impact

Plaintiffs' spiritual, charitable, and educational activities, and the individuals who rely on the

Catholic Church's nonprofit, religious affiliated/related organizations for the basic needs of food,

shelter, and education, as well as other charitable programs.  The fines/penalties/"taxes" also will

negatively affect Plaintiffs' financial situation because  donors to these

spiritual/charitable/educational organizations may not wish to donate funds when the funds could

be diverted to the Government in the form of fines/penalties/"taxes."

---

claims that because "church plans" are "specifically excluded from the ambit of ERISA[,]" ERISA
enforcement authority is "not available" to be used against the Plaintiffs' TPAs, because of the nature of
the heal plan being a "self-insured church plan." Id.

Simply put, the Government argues that "[b]ecause the regulations allow [P]laintiffs to opt out of
providing or paying for contraceptive services, and because [the Government] lack[s] the authority to
require the TPAs of self-insured church plans to make these payments, [P]laintiffs have not established an
injury in fact . . . ." Id.  This argument fails for two reasons.

First, the Government ignores the fact that the "accommodation" still requires Plaintiffs to sign a form
(EBSA Form 700) to "opt out" of providing or paying for contraceptive services (which simultaneously
triggers their TPAs to do so).  Thus, the portion of the "accommodation" requiring an action on the part of
Plaintiffs (i.e., the signature and delivery of the form to the TPA) is still enforceable and required.   For
these Plaintiffs, it is the signature on the form that triggers eternal ramifications for the signators because
Plaintiffs believe that the signature constitutes the direct facilitation of moral evil.

Second, the Government focuses on the alleged fact that it cannot enforce Plaintiffs' TPA to provide or
pay for the contraceptive services after the TPA receives the signed form from Plaintiffs.  This argument
suggests that Plaintiffs and/or their TPA may ignore or disobey regulation(s) or portions of regulations
because the Government may not be able to punish them for doing so.  The Government also argues that
"there is no reason to believe that Plaintiffs' TPA would voluntarily provide such coverage over their
clients' stated religious objections to doing so."  Government's Brief in Opposition, doc. no. 23, p. 3.
This argument fails because it ignores 26 C.F.R. § 54.9815–2713, which prohibits Plaintiffs from
"influencing" the decision of the TPA.  Unless, of course, this is yet another regulation that can be
ignored.  Thus, it appears from the Government's argument, that Plaintiffs may ignore the regulation
concerning "influencing" their TPA, and their TPAs can ignore the law requiring it to provide
contraceptive coverage once it receives a form from Plaintiffs.  This Court finds that Plaintiffs cannot
morally disobey a regulation – or instruct their TPA to do so – because there allegedly may not be any
enforceable consequences at this point in time.  As Monsignor Riffle explained, signing the form – and
the Government never indicated that the Plaintiffs could do otherwise – without knowing with "certitude"
whether or not the TPA would actually provide the contraceptive coverage, would still violate Plaintiffs'
religious beliefs.  Hearing Transcript, doc. no. 40, p. 81, lines 6-20.

V.      **Conclusions of Law**

    **A.  Overview**

The Court begins by noting that on June 20, 2014, the Court granted Plaintiffs' Motion for an Expedited Preliminary Injunction. Doc. nos. 26-27. The Court did so without conducting a hearing based on the representations made by counsel for the Parties during a June 3, 2014 status conference. Counsel indicated that given the Court's familiarity with the issues presented in the case from its experience in the *Zubik* and *Persico* matters, and in light of the very constricted time frame within which they had to comply with the "accommodation," all Parties agreed to waive a preliminary hearing and have this Court decide the preliminary injunction matter solely on the written record. Status Conference Transcript, doc. no. 20, pg. 6-7, line 25, lines 1-4. In light of this agreement by the Parties, the Court ordered the Parties to prepare a Stipulation as to any undisputed facts – as they had done in the *Persico* and *Zubik* cases – and set a date for a permanent injunction hearing.

On June 6, 2014, in the Parties' jointly filed "Stipulation to Undisputed Fact" (doc. no. 22), the Government conceded that: (1) Plaintiffs' religious beliefs are sincerely held, and (2) Plaintiffs' participation in the accommodation – specifically, signing the self-certification form – would violate their sincerely-held religious beliefs. The Government also stipulated that it did not dispute the factual allegations set forth in: the Complaint (doc. no. 1); the declaration of Monsignor Larry Kulick (doc. no. 17-3); the declaration of Monsignor Raymond Riffle (doc. no. 17-4); the declaration of Christine Roskovensky (doc. no. 17-5); the declaration of Charles Quiggle (doc. no. 17-6); the declaration of Bishop Lawrence Brandt (doc. no. 17-7); and the "Preliminary Injunction papers" (doc. nos. 16 and 17). Therefore, the Court ruled on Plaintiffs' Motion for an Expedited Preliminary Injunction based on the facts set forth in those documents

29

because they were (and are) uncontested.  See doc. nos. 26-27, Memorandum Opinion and Order on Plaintiffs' Motion for an Expedited Preliminary Injunction.

The Court's decision in this case, like the Court's decisions in *Zubik* and *Persico*, is guided by decisions in other Courts across the Country.  In this instance, the most recent Supreme Court decision, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. ___, 134 S.Ct. 2751 (June 30, 2014), is especially instructive on some – if not all – of the legal issues presented herein.

Although *Hobby Lobby* was decided in favor of for-profit, closely-held corporations (Hobby Lobby and Conestoga Wood Specialities) who were not offered an "accommodation" under the regulations, *Hobby Lobby* is still instructive.  Plaintiffs here, like the plaintiffs in *Hobby Lobby*, challenged provisions relating to the contraceptive mandate of the ACA. Similarly, Plaintiffs here, like the plaintiffs in *Hobby Lobby*, assert that their religious freedom is violated by the contraceptive mandate, despite the fact that the Government provided Plaintiffs with an "accommodation" to the mandate.  The only difference between these Plaintiffs and the *Hobby Lobby* plaintiffs arises out of the actions these Plaintiffs must take in order to comply with the "accommodation" to the contraceptive mandate as opposed to the actions that the *Hobby Lobby* plaintiffs had to take to comply with the mandate itself. Nonetheless, the analysis is generally the same: this Court is tasked with determining whether the law (in this case the "accommodation" provision of the contraceptive mandate) requires these Plaintiffs to take actions that violate their sincerely-held religious beliefs thereby burdening their freedom to exercise their religion.

In addition to the *Hobby Lobby* decision, this Court also notes that three days after publishing its *Hobby Lobby* decision, the United States Supreme Court granted an injunction

pending appeal to Wheaton College in *Wheaton College v. Burwell,* __ U.S. __, 134 S.Ct. 2806

(July 3, 2014).  Although the Court in *Wheaton* did not decide the "accommodation issue" on the

merits – which is the seminal issue facing this Court in the instant case, as it was in *Zubik* and

*Persico* – it did enjoin the Government from enforcing the challenged accommodation provisions

and related regulations against Wheaton College, specifically the regulations related to the

submission of EBSA Form 700 – the very form at the heart of the issue in this case.  *Wheaton,*

134 S.Ct. at 2807 (The Government is enjoined from enforcing against Wheaton College "the

challenged provisions of the [ACA] and related regulations pending final disposition of appellate

review.  To meet the condition for injunction pending appeal, the applicant need not use the form

prescribed by the Government, EBSA Form 700, and need not send copies to health insurance

issuers or third-party administrators.").

    Turning to the instant matter, Plaintiffs have requested that this Court grant a permanent

injunction, arguing that the religious employer "accommodation," which requires them to

facilitate/initiate compliance with the contraceptive mandate, violates their rights under the

RFRA and the Free Exercise Clause of the First Amendment.

### B.  Permanent Injunction Test

    According to well-established principles of equity, "[a] plaintiff seeking a permanent

injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must

demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such

as monetary damages, are inadequate to compensate for that injury; (3) that, considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

(4) that the public interest would not be disserved by a permanent injunction."  *Monsanto Co. v.*

*Geertson Seed Farms,* 561 U.S. 139, 157 (2010) citing *eBay Inc. v. MercExchange, L.L.C.*, 547

U.S. 388, 391 (2006).  *See also Boring v. Google Inc.*, 362 Fed.Appx. 273, 282 (3d Cir. 2010)

("Pennsylvania law provides that in order to establish the right to injunctive relief, a plaintiff

must establish that his right to relief is clear, that an injunction is necessary to avoid an injury

that cannot be compensated by damages, and that greater injury will result from refusing rather

than granting the relief requested."); *Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir. 2001) ("In

deciding whether to grant a permanent injunction, the district court must consider whether: (1)

the moving party has shown actual success on the merits; (2) the moving party will be

irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction

will result in even greater harm to the defendant; and (4) the injunction would be in the public

interest.").

There is no significant difference between the standards for a preliminary injunction and

a permanent injunction.  *See Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546

n. 12 (1987) ("The standard for a preliminary injunction is essentially the same as for a

permanent injunction with the exception that the plaintiff must show a likelihood of success on

the merits rather than actual success.").  Plaintiffs' standard of proof for a permanent injunction

is the preponderance of the evidence standard for injunctive relief, or demonstration of a fact as

"more likely than not." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (citing

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983)).

Accordingly, this Court has evaluated Plaintiffs' request for a permanent injunction and

considered their request under a preponderance of evidence standard.  The Court concludes,

based on its aforementioned findings of fact, that Plaintiffs have met their burden of proving

success on the merits of their claim with respect to "Count I – Substantial Burden on Religious Exercise in Violation of RFRA" as explained more thoroughly *infra*.[12]

1.    **Success on the Merits - RFRA**

a.    **Background**

Plaintiffs, in their Motion for Expedited Preliminary Injunction, asked this Court to enjoin Defendants from issuing, applying, and enforcing 42 U.S.C. § 300gg-13(a)(4) as further regulated by 45 C.F.R. § 147.130(a)(1)(iv) against Plaintiffs and their group health plans.  Doc. no. 16.  Section "III. B. 2." above, 45 C.F.R. § 147.130(a)(1)(iv) is the regulation that allows HRSA to "establish exemptions" from group health plans maintained by "religious employers" with respect "to any requirement to cover contraceptive services[.]"  See 45 C.F.R. § 147.130(a)(1)(iv)(A). Id.  As noted above, the Court granted Plaintiffs' Motion for Expedited Preliminary Injunction.  Doc. nos.  26-27.

After receiving hundreds of thousands of comments from the public, including religious individuals and entities, concerning the definition of "religious employer" for the benefit of receiving an "exemption" from the contraceptive mandate, the "final rule" promulgated by HRSA defined a "religious employer" as "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code . . . ."  45 C.F.R. § 147.131(a).

Again, as noted in Section "III. B. 2." above, the nonprofit entities included in the relevant portion of Section 6033 of the Internal Revenue Code are:

---

[12] Having found that Plaintiffs successfully proved the merits of their RFRA claim by a preponderance of the evidence (for the reasons stated in greater detail below) and finding that a violation of this claim alone warrants the issuance of a permanent injunction, this Court need not reach any additional claims filed by Plaintiffs at this time.  In addition, this Court is aware that the *Persico*, *Zubik*, and *Geneva College* cases have all been consolidated before the United States Court of Appeals for the Third Circuit and are pending resolution by said Court on substantially similar, if not identical, issues.  Thus, no additional discussion on the remaining claims presented by Plaintiffs in this matter is warranted.

(i) churches, their integrated auxiliaries, and conventions or associations of churches,

           \*       \*       \*

(iii) the exclusively religious activities of any religious order.

26 U.S.C.A. § 6033(a)(3)(A).

Given this description, Plaintiffs in the instant cases (the nonprofit, religious affiliated/related entities) fail to meet the definition of a "religious employer" entitled to the "exemption."

In response to concerns that the application of the religious employer "exemption" was too narrow, and instead of broadening the "exemption," a second regulation was enacted that allowed for non-secular, nonprofit employers to receive an "accommodation," whereby these entities could self-certify that they were "eligible organizations" and thereby avoid <u>directly</u> providing contraceptive products, services, and counseling.

As noted above, this "accommodation" is limited to "eligible organizations" that: (1) oppose providing coverage for some or all of any contraceptive services required to be covered under the contraceptive mandate "on account of religious objections[;]" (2) are organized and operate as a nonprofit entity; (3) hold themselves out as a religious organization; and (4) "self-certify," in a form and manner specified by the Secretary, that it satisfies the criteria in (1) through (3) above.  See 45 C.F.R. § 147.131(b); see also 78 Fed. Reg. at 39,874-75.  "The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974."  Id.

Because the non-secular, nonprofit Plaintiffs in the instant cases meet the first three criteria of the "accommodation," they need to "self-certify," as required by the fourth criterion, to be deemed an "eligible organization" thereby entitling them to obtain the religious employer

34

"accommodation."   It is the fourth criterion of the religious employer "accommodation" that Plaintiffs contend violates their rights under the RFRA and the First Amendment.[13]

In order to qualify for the religious employer "accommodation," and thus avoid directly providing or paying for contraceptive products, services, and counseling through their own health plans, Plaintiffs in these cases must self-certify that they: (1) oppose providing such contraceptive coverage on account of their religious objections; (2) are organized and operate as nonprofit entities; and (3) hold themselves out as a religious organization.  This Court found as fact that Plaintiffs' self-certification forms must be executed by the Bishop of Greensburg or at his directive.

### b.  Substantial Burden under the RFRA

Plaintiffs assert that by requiring self-certification and thereby facilitating or initiating the process of providing contraceptive products, services, and counseling, via a third party, the "accommodation," violates their rights under the RFRA.

The RFRA provides, in pertinent part, as follows:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

(1) is in furtherance of a compelling governmental interest; and

---

[13] Notably, subpart "(c)" of same regulation provides that entities who meet all four criteria, thereby entitles them to an "accommodation," and will not have to pay for the contraceptive products, services, and counseling.  A third party will.  See 45 C.F.R. § 147.131(c).

> (2) is the least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C.A. § 2000bb-1.

This Court must look to what is meant by "substantial burden" under the RFRA.  As the United States Supreme Court stated in *Hobby Lobby*, substantial burden is <u>not</u> to be determined by "whether the religious belief asserted in an RFRA case is reasonable[;]" in fact, this Court "must not presume to determine . . . the plausibility of a religious claim." *Hobby Lobby*, 134 S.Ct. at 2778.  Instead, in determining whether a substantial burden has been placed on these Plaintiffs, this Court's own "'narrow function . . . in this context is to determine'" whether the line drawn reflects "an honest conviction,'" and there is no dispute that it does." *Hobby Lobby* , 134 S.Ct. at 2779, quoting *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, at 716 (1981) (internal citation omitted).

Here, the Government (adopting its prior arguments made in *Zubik* and *Persico*), argues that the "accommodation" merely requires the Bishop of Greensburg (or his designees) to sign the self-certification form, on behalf of the Diocese's respective nonprofit, religious affiliated/related entities, and does not rise to the level of a "substantial burden," as that term has been defined in connection with the RFRA.  The Government argues that any impact on Plaintiffs' sincerely-held religious beliefs created by Plaintiffs' self-certification is too attenuated to rise to the level of creating a substantial burden on Plaintiffs.

However, the Government acknowledges that the act of self-certification will require the Plaintiff-entities to sign the self-certification form and supply their TPA with the names of the Plaintiffs' respective employees so that the TPA may provide (and/or pay for) contraceptive products, services, and counseling.  The Government also concedes that Plaintiffs have

sincerely-held religious beliefs with respect to: (1) the sanctity of human life from conception to natural death; (2) unity of worship, faith, and good works ("faith without good works is dead"); and (3) the facilitation of evil is as morally odious as the proliferation of evil.

Given these concessions, the Court disagrees with the Government that Plaintiffs' ability or inability to "merely sign a piece of paper," and thus comport with the "accommodation," is all that is at issue here.  Again, as succinctly stated by Bishop Brandt, although the "self [-] certification form may take only a few minutes to sign, its ramifications are eternal because it constitutes direct facilitation of moral evil."  Declaration of Bishop Brandt, doc. no. 17-7, ¶ 17 (emphasis added); Stipulation to Undisputed Facts, doc. no. 22, ¶ 1.

Here, the issue is whether Plaintiffs, being non-secular in nature, have successfully proven that their right to freely exercise their religion under RFRA has been substantially burdened by the "accommodation," which requires the Bishop of Greensburg (or his designees) to sign a form (EBSA Form 700) that thereby facilitates/initiates the provision of contraceptive products, services, and counseling.  Based upon the evidence of record as set forth in the Court's factual findings, this Court concludes that the accommodation substantially burdens Plaintiffs' right to freely exercise their religion.

Just as this Court noted in the *Zubik* and *Persico* matters, the Court likewise concludes that:

> . . . [A]lthough the "accommodation" legally enables Plaintiffs to avoid directly paying for the portion of the health plan that provides contraceptive products, services, and counseling, the "accommodation" requires them to shift the responsibility of purchasing insurance and providing contraceptive products, services, and counseling, onto a secular source.  The Court concludes that Plaintiffs have a sincerely-held belief that "shifting responsibility" does not absolve or exonerate them from the moral turpitude created by the "accommodation"; to the contrary, it still substantially burdens their sincerely-held religious beliefs.

*Zubik v. Sebelius,* 983 F.Supp.2d 576, 606 (W.D. Pa. 2013).

In addition, the Court also concludes that the "accommodation" and the "exemption" to the contraceptive mandate divide the Catholic Church, which also creates a substantial burden on Plaintiffs' exercise of religion.  Simply put, the religious employer "exemption" enables some religious employers to completely eliminate the provision of contraceptive products, services, and counseling through the Diocese's health plan and third parties; while the religious employer "accommodation" requires other religious employers (often times the same member with the same sincerely-held beliefs) to take affirmative actions to facilitate/initiate the provision of contraceptive products, services, and counseling – albeit from a third-party (the TPA).  How these two separate provisions – the "exemption" from the contraceptive mandate and "accommodation" to the contraceptive mandate – divide the Catholic Church was discussed in greater detail in this Court's Memorandum Opinion in *Zubik* and *Persico*, and the Court adopts that portion of its prior Opinion by reference as if more fully set forth herein.  *See Zubik v. Sebelius*, 983 F.Supp.2d at 606-608, entitled, "iii. The 'Accommodation' and the 'Exemption' Divide the Catholic Church which Creates a Substantial Burden."

### c.   Compelling Government Interest

Given that the Court has concluded that the "accommodation" places a substantial burden on Plaintiffs' free exercise of religion under the RFRA, the Court will now consider whether the RFRA's exception has been met.  42 U.S.C.A. § 2000bb-1(b).  Accordingly, the Court must determine whether the contraceptive mandate, as applied to Plaintiffs via the "accommodation": (1) furthers a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest.  Id.

As to the compelling interest test, the Government indicated that its compelling governmental interests in this case were the same as those it had espoused in *Zubik* and *Persico*, namely: (1) "the promotion of public health" and (2) "assuring that women have equal access to health care services."  *See Zubik,* 983 F.Supp.2d at 610; Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction, doc. no. 23; Stipulation to Undisputed Facts, doc. no. 22.  As in the *Zubik* and *Persico* cases, the Court notes that these are certainly important interests; however, the existence of the "exemption" is an indication that the Government found its compelling interests could not "overbalance the legitimate claims to the free exercise of religion" asserted by some religious employers – *i.e.,* the houses of worship.  *Yoder*, 406 U.S. at 215, 92 S.Ct. 1526; *see also Geneva College*, 960 F.Supp.2d 588, 599–601 (W.D.Pa. 2013).  Similarly, in *Hobby Lobby*, the Government asserted that the contraceptive mandate serves "a variety of important interests" but the Supreme Court noted that the interests were "couched in very broad terms, such as promoting 'public health' and 'gender equality.'"  134 S.Ct. at 2779.

Specifically, the *Hobby Lobby* Court stated:

> [The] RFRA, however, contemplates a "more focused" inquiry:  It "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."  *O Centro*, 546 U.S., at 430–431, 126 S.Ct. 1211 (quoting § 2000bb–1(b)).  This requires us to "loo[k] beyond broadly formulated interests" and to "scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants" – in other words, to look to the marginal interest in enforcing the contraceptive mandate in these cases.  *O Centro*, supra, at 431, 126 S.Ct. 1211.

*Id.*

This Court, in *Zubik* and *Persico,* agreed that the two interests espoused by the Government – the same two interests argued here – are "certainly important governmental interests," but the Court concludes here, as it did in *Zubik* and *Persico,* that these two interests, as

so broadly stated, are not "of the highest order" such that "those not otherwise served can

overbalance legitimate claims to the free exercise of religion."  *Zubik*, 983 F.Supp.2d at 610

citing *Yoder*, 406 U.S. at 215.

Given that no new argument has been raised with respect to the "important governmental

interests" advanced by the contraceptive mandate, this Court adopts its statements referenced

above and set forth in *Zubik* and *Persico* as follows:

> . . . the Court first notes that the existence of a religious employer
> "exemption" is an acknowledgment of the lack of a compelling
> governmental interest as to religious employers who hire employees for
> their "houses of worship."  Simply put, as stated more fully above, the
> religious employers who qualify for the "exemption" do not have to
> directly provide, nor indirectly facilitate/initiate, the provision of any
> contraceptive products, services, and counseling.  At a minimum, the
> existence of the "exemption" is an indication that the Government found
> its compelling interests to (1) promote public health, and (2) assure that
> women would have equal access to health care services, could not
> "overbalance the legitimate claims to the free exercise of religion"
> asserted by some religious employers – *i.e.,* the houses of worship.  *Yoder*,
> 406 U.S. at 215; see also *Geneva College*, 2013 WL 3071481 at *10.

*Zubik*, 983 F.Supp.2d at 610.

As applied to the instant case, the Government's argument that its compelling interests

will overbalance the exact same legitimate claims to the free exercise of religion (at times being

raised by the same individuals – *i.e.*, Bishop Brandt) fails when asserted on behalf of a religious

affiliated/related employer.  If the Court were to conclude that the Government's stated interests

were sufficiently "compelling" to outweigh the legitimate claims raised by the nonprofit,

religious affiliated/related Plaintiffs (Catholic Charities and St. John's School), the net effect (as

noted above) would be to allow the Government to cleave the Catholic Church into two parts:

worship, and service and "good works," thereby entangling the Government in deciding what

comprises "religion."   Thus, the Court refuses to conclude that the Government has compelling

interests which overbalance the legitimate claims to the free exercise of religion raised by Plaintiffs.

Moreover, as noted in *Zubik* and *Persico,* this Court remains unconvinced that the "exemption" itself (which dictates that certain religious employers can legally decline to directly and indirectly facilitate the provision of contraceptive products, services, and counseling) was predicated upon a "public health" basis to meet the two purported compelling interests.  Instead, a religious employer's qualifications for the "exemption" is predicated upon the unrelated question of whether that religious employer files the IRS Form 990.  45 C.F.R. § 147.131(a) (August 1, 2013).

Accordingly, if there is no compelling governmental interest to apply the contraceptive mandate to the religious employers who operate the "houses of worship," then there cannot be any compelling governmental interest to apply (even in an indirect fashion) the contraceptive mandate to the religious employers of the nonprofit, religious affiliated/related entities, like Plaintiffs in this case.

Furthermore, the Government offered no new argument to support its compelling interest position.  In *Zubik* and *Persico*, the Government argued (but offered no real evidence) that "[h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers, including organizations eligible for the accommodation [*i.e.,* Plaintiffs in the instant case], to employ people of the same faith who share the same objection, and who would therefore be less likely to use contraceptive services even if such services were covered under their plan."  *Zubik*, 983 F.Supp.2d at 610.  In light of the fact the Government has not offered any new evidence on this point, and given that there was none

offered in *Zubik* and *Persico,* the Court continues to find this statement speculative, and unsubstantiated by the record and, therefore, unpersuasive.

Next, the Court also notes that, like *Zubik* and *Persico*, the portions of the Administrative Record offered into evidence by the Government suggest that "women who receive their health coverage through employers <u>like plaintiffs</u> would face negative health and other outcomes . . . ." 77 Fed. Reg. at 8728; 78 Fed. Reg., at 39, 887 (emphasis added).   Again, despite this assertion, the Government has failed to offer any testimony or other evidence during the injunction hearing to support its claim that Plaintiffs' female employees, insured female spouses or insured female dependents of employees have, in fact, suffered in the past, or will in the future, any "negative health or other outcomes," without the enforcement of the contraceptive mandate.  No evidence was offered on this point during the injunction hearing in this matter despite the fact that the Court pointed out the shortfall in its Memorandum Opinion in *Zubik* and *Persico*.

As stated above and in *Zubik* and *Persico*, whether intended or not, the application of two distinct regulations (one providing a complete "exemption," and the other merely providing an "accommodation") to religious employers who hold the same basic religious tenets unnecessarily – and in direct contravention to the RFRA and the Free Exercise Clause of the First Amendment – entangles the Government into determining what constitutes "religion."[14]   By having these two, separate regulations "on the books," the Government has essentially detached worship and faith from "good works" and has determined that a religious employer's complete freedom to exercise religion ends at the church doors.

---

[14] Again, as noted by the Supreme Court in *Hobby Lobby*, it is not for a Court to say whether a religious belief is "mistaken or insubstantial;" rather, it is the Court's obligation to determine whether the belief reflects "an honest conviction."  134 S.Ct. 2778-79.  In the instant case – just like *Hobby Lobby* – there is no dispute that the religious belief in question does reflect an honest conviction.

For all of the reasons set forth above, the Court concludes that the Government has again failed, both factually and legally, to establish that its two stated governmental interests are so compelling such that "those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Zubik*, 983 F.Supp.2d at 611, quoting *Yoder*, 406 U.S. at 215, 92 S.Ct. 1526.

### d. Least Restrictive Means

Given that (1) Plaintiffs have met their burden of showing that the "accommodation" creates a substantial burden on their free exercise of religion, and (2) the Government has failed to meet its burden of proving that it had a compelling interest to apply the contraceptive mandate, via the "accommodation," to Plaintiffs, the Court need not consider whether the "accommodation" was the least restrictive means of meeting the stated compelling interests. Nevertheless, the Court also concludes that the Government has failed to adduce evidence that definitively establishes that it used the least restrictive means to meet the stated compelling government interests.

At the outset, the Court notes that Supreme Court in *Hobby Lobby* commented that the "least-restrictive-means standard is exceptionally demanding" and was not satisfied in that case. *Hobby Lobby,* 134 S.Ct. at 2780. Moreover, the *Hobby Lobby* Court provided means that could have been used in lieu of the "accommodation" to meet the Government's stated compelling interests:

> The most straightforward way of doing this would be for the Government to assume the cost of providing the four contraceptives at issue to any women who are unable to obtain them under their health-insurance policies due to their employers' religious objections. This would certainly be less restrictive of the plaintiffs' religious liberty, and HHS has not shown, see § 2000bb–1(b)(2), that this is not a viable alternative. HHS has not provided any estimate of the average cost per employee of providing access to these contraceptives, two of which, according to the

> FDA, are designed primarily for emergency use.  See Birth Control:
> Medicines to Help You, online at http:// www. fda. gov/ forconsumers/
> byaudience/ forwomen/ free publications/ ucm 313215. htm.  Nor has
> HHS provided any statistics regarding the number of employees who
> might be affected because they work for corporations like Hobby Lobby,
> Conestoga, and Mardel.  Nor has HHS told us that it is unable to provide
> such statistics.  It seems likely, however, that the cost of providing the
> forms of contraceptives at issue in these cases (if not all FDA-approved
> contraceptives) would be minor when compared with the overall cost of
> ACA.  According to one of the Congressional Budget Office's most recent
> forecasts, ACA's insurance-coverage provisions will cost the Federal
> Government more than $1.3 trillion through the next decade.  See CBO,
> Updated Estimates of the Effects of the Insurance Coverage Provisions of
> the Affordable Care Act, April 2014, p. 2.[ ]  If, as HHS tells us, providing
> all women with cost-free access to all FDA-approved methods of
> contraception is a Government interest of the highest order, it is hard to
> understand HHS's argument that it cannot be required under RFRA to pay
> anything in order to achieve this important goal.

*Id*. at 2780-81.

Turning to the instant case, at the permanent injunction hearing held on July 18, 2014, the

Government did not offer any additional evidence concerning whether the "accommodation" was

the "least restrictive means" of meeting the Government's stated compelling interests.  Thus,

based on the Stipulations made prior to the Court's entry of the preliminary injunction in this

case, the Court will review the arguments the Government made in *Zubik* and *Persico*.

In *Zubik* and *Persico,* the Court noted and held as follows with respect to the "least

restrictive means" arguments raised by the Government:

> First, the Government proffers that the "accommodation" was not
> only the "least restrictive means," but the "only possible means" of
> furthering the two compelling governmental interests to: (1) promote
> public health, and (2) assure that women would have equal access to
> health services.  The Government's position is simply that this
> "accommodation" (*i.e.*, the acts of signing a self-certification form and
> gathering/delivering employee list(s) to their health insurer or TPA) was
> the "least" and the "only possible means," of furthering the two stated
> compelling governmental interests.

If the Government is correct that the entire fundamental statutory scheme set forth in the ACA will fail, without the participation in the contraceptive mandate by nonprofit, religious affiliated/related Plaintiffs and others like them (*i.e.*, food pantries, homeless shelters, etc.), which operate under the authority of an already exempt religious body (*i.e.*, Plaintiff Erie Diocese), then the foundation of the "statutory scheme" is certainly troubled.

Under the RFRA, the "accommodation" must be the "least restrictive means" to further the two stated compelling governmental interests. The Government neither at the Injunction Hearing, nor in the Administrative Record, offered any evidence concerning: (1) the identity of all other possible "least restrictive means" considered by the Government; (2) the analysis of each of the "means" to determine which was the "least" restrictive; (3) the identity of the person(s) involved in the identification and evaluation of the alternative "means"; or (4) "evidence-based" analysis as to why the Government believes that the "accommodation" is the "least restrictive means."

Instead, the Government argues that all the "accommodation" requires is a signature on a piece of paper. Once the signed document is received by the insurer or TPA, the contraceptive products, services, and counseling will then be made part of the nonprofit, religious affiliated/related Plaintiffs' health care plan at no cost to the Plaintiffs—except, of course, for the incalculable cost of the loss of their rights to freely exercise their religion.

As noted throughout this Opinion, this Court has found that the Government conceded that Plaintiffs' beliefs are sincerely-held. Despite these concessions, the Government trivializes these sincerely-held beliefs of Plaintiffs throughout its Brief in Opposition, to wit, the "accommodation": (1) "requires virtually nothing of Plaintiffs" . . . ; (2) "certainly does not require Plaintiffs to modify their behavior in any meaningful way" . . . ; (3) is "no more than a de minimis burden . . . ; (4) requires Plaintiffs to "do next to nothing" . . . ; and (5) Plaintiffs "need only fulfill the self-certification requirement and provide the completed self-certification to their issuers and TPAs" . . . . Further, there is nothing in the record to establish, or even hint, that a broader "religious employer" exemption, to include Plaintiffs (*i.e.,* Catholic Charities, Prince of Peace Center, et al.), would have any impact at all on "the entire statutory scheme."

During the Injunction Hearing, the Court specifically asked the Government about its stated compelling interests and the means it took to advance them. The Government directed the Court's attention to a precise section of the Administrative Record which reads, in pertinent part:

> Fifth, some commentators asserted that the contraceptive coverage requirement [the contraceptive mandate] is not the least restrictive means of advancing those compelling interests, and proposed various alternatives to these regulations. All of these proposals were considered, and it was determined that they were not feasible and/or would not advance the government's compelling interests as effectively as the mechanisms established in these final regulations and the preventative services coverage more generally.

78 Fed.Reg. 39888 (July 2, 2013).

> As to this "argument," the Court first notes that it is not the commentators' responsibility to draft the regulations employing the least restrictive means—that obligation rests with the Government.  Second, the regulation itself clearly announces that the alternatives to the current regulations—including the contraceptive mandate—would not advance the Government's interests "as effectively as" the contraceptive mandate and the "accommodation."  Greater efficacy does not equate to the least restrictive means.

> Thus, the Court concludes that the Government failed to present any credible evidence tending to prove that it utilized the least restrictive means of advancing those interests.

*Zubik*, 983 F.Supp.2d at 611-612.

### e.  Conclusion – Success on the Merits

After carefully considering the testimony of Cardinal Dolan (offered at the injunction hearing in this case by way of transcript), Bishop Brandt, and all of the other witnesses for Plaintiffs who were either called to testify during the hearing or who offered Declarations whose facts the Government stipulated were true, the Court made the factual determination that Plaintiffs possess a sincerely-held belief that the burden imposed by the execution of the self-certification form is substantial.  Plaintiffs here – like those in *Zubik* and *Persico*– sincerely believe that by signing the self-certification form, required by the "accommodation," they will facilitate/initiate the provision of contraceptive products, services, and counseling.  Plaintiffs also

sincerely believe that this facilitation/initiation is no different than if Plaintiffs directly provided those same products, services, and counseling.

The Court concludes that the "accommodation" places a substantial burden on Plaintiffs' ability to exercise their religion. The Court also concludes that the Government failed to show these regulations meet a compelling governmental interest and are sufficiently narrowly-tailored to meet those interests, and/or to demonstrate that the "accommodation" is the least restrictive means to meet those stated interests.

Based on the foregoing analysis, the Court concludes that Plaintiffs have successfully proven a violation of their free exercise of religion under the RFRA and thereby meet the first element of the permanent injunction test.

### 2. Irreparable Injury

The basis of injunctive relief in Federal Courts has always been irreparable harm and inadequacy of legal remedies. *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506-507 (1959). What may constitute "irreparable harm" in a particular case is, of course, dependent upon the particular circumstances of the case. *Oburn v. Shapp*, 521 F.2d 142, 151 (3d Cir. 1975).

"The key word in this consideration is Irreparable.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Oburn,* 521 F.2d at 151, citing *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (U.S. App. D.C. 1958) (emphasis in original); quoted with approval *Sampson v. Murray,* 415 U.S. 61, 90 (1974).

The Supreme Court of the United States has held "[t]he loss of First Amendment freedoms," which implicates the Free Exercise Clause as protected by the RFRA, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Establishing a likely RFRA violation satisfies the irreparable harm factor. *Hobby Lobby*, 723 F.3d 1114, 1146 (10th Cir. 2013). More recently, in cases on point or nearly on point with the instant matter, the Supreme Court has granted injunctions pending appeal. *See*, *i.e., Wheaton College*, 134 S.Ct. 2806 (majority granting injunction to plaintiffs pending appeal, noting plaintiff did <u>not</u> have to ". . . use the form prescribed by the Government, EBSA Form 700, and need not send copies to health insurance issuers or third-party administrators"); *Little Sisters of the Poor, Home for the Aged v. Sebelius*, 571 U.S. ___, 134 S.Ct. 1022 (Jan. 24, 2014) (granting injunction to plaintiffs pending appeal, noting, "The Court issues this order based on <u>all the circumstances of the case</u>, and this order should not be construed as an expression of the Court's views on the merits.") (emphasis added).[15]

Although this Court cannot interpret the two recent Supreme Court orders granting injunctions pending appeal as "law on the merits," this Court finds that the Supreme Court has twice considered whether an injunction should issue under substantially similar facts, and both

---

[15] Interestingly, the *Wheaton* matter, unlike the *Little Sisters* matter, contained a dissent wherein three Justices, who objected to the grant of an injunction in the *Wheaton* case stated:

> [t]his case is crucially <u>unlike</u> *Little Sisters of the Poor v. Sebelius*, 571 U.S. ___, 134 S.Ct. 1022, 187 L.Ed.2d 867 (2014). There, the Court issued a comparable order 'based on all the circumstances of the case' – in particular, the fact that the applicants' third-party administrator was a 'church plan' that had no legal obligation or intention to provide contraceptive coverage.

*Wheaton,* 134 S.Ct. at 2814, fn. 6 (internal citation omitted)(emphasis added). In the instant matter, the Parties have stipulated that the insurance plan at issue is also "a church plan" possibly rendering this case more on point with the *Little Sisters of the Poor*. This Court further notes that in the instant case, despite the Government's argument that it cannot enforce certain regulations against Plaintiffs and/or their TPA because the insurance at issue is a "church plan" (see footnote 11, *supra*.), the Supreme Court in *Little Sisters* opted to grant the extraordinary relief of an injunction pending appeal despite the fact that a purported "church plan" was at issue.

times has found that an injunction should issue.  This suggests that irreparable harm will ensue if

no injunction were to issue.  *See Wheaton College,* 134 S.Ct. at 2810 ("[T]his Court 'may issue

all writs necessary or appropriate in aid of [its] . . . jurisdictio[n] and agreeable to the usages and

principles of law.'  28 U.S.C. § 1651(a).  This grant of equitable power is a failsafe, 'to be used

'sparingly and only in the most critical and exigent circumstances.'" *Ohio Citizens for*

*Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313, 107 S.Ct. 682, 93 L.Ed.2d 692 (1986)

(SCALIA, J., in chambers)").

      In this case, Plaintiffs argue that they will suffer irreparable harm without an injunction.

Although this Court, by entering the preliminary injunction in this matter, has solved the

immediate problem, the preliminary injunction is only a temporary solution.   Based on the

foregoing analysis, this Court concludes that because a violation of the RFRA has been proven,

irreparable harm will befall Plaintiffs if a permanent injunction in this matter is not issued.

      **3.    Balance of Hardships between the Parties**

      The balance of hardships factor "assesses the relative effect of granting or denying an

injunction on the parties." *Carnegie Mellon University v. Marvell Technology Group, Ltd*., 2014

WL 1320154 (W.D.Pa., March 31, 2014) *citing Apple Inc. v. Samsung Electronics Co., Ltd.,*735

F.3d 1352, 1371 (C.A. Fed. 2013).  "The balance of harms analysis examines the harm of

granting or denying the injunction upon both of the parties to the dispute and upon other

interested parties, including the public."  *Archdiocese of St. Louis v. Burwell*, __ F.Supp.2d ___,

2014 WL 2945859 (E.D. Mo., June 30, 2014) *citing Noodles Development, LP v. Ninth Street*

*Partners. LLP*, 507 F.Supp.2d 1030, 1038-39 (E.D. Mo. 2007) (internal citations omitted).

"When evaluating the balance of hardships, the court weighs the irreparable harm plaintiff would

suffer absent an injunction against the harm such an injunction would inflict on defendant[.]"

*Rush Construction, Inc. v. United States,* ___ Fed.Cl. ___, 2014 WL 3507336 (June 30, 2014).

In the instant case, this Court has already determined that Plaintiffs have prevailed on the merits of their RFRA claim and that they will suffer irreparable harm if the permanent injunction does not issue.  Moreover, the permanent injunction Plaintiffs seek would only apply to one of the eight categories of preventive services for women required by the ACA and its implementing regulations.

Despite the Government's two stated  interests: (1) "the promotion of public health" and (2) "assuring that women have equal access to health care services," the Court notes that any employers with fifty (50) or less employees do not have to provide their employees with any health care coverage at all.  26 U.S.C. § 4980H(c)(2)(A).

In addition, religious employers who can meet the criteria for an "exemption" have to provide health coverage to their employees, but do not have to offer contraceptive products, services, and counseling.  They do not have to "sign a form" thereby facilitating/initiating the provision of contraceptive products, services, and counseling through a third party.

Finally, there are "innumerable" employers who have "grandfathered" health coverage plans which may or may not provide for all of the components required under the ACA, including the contraceptive products, services, and counseling required by the contraceptive mandate.

As stated by this Court in *Zubik* and *Persico*:

> . . .[T]he combined nationwide total of all of those employers who fall within an exclusion, an exemption, or whose plans are "grandfathered" (approximately 100 million individuals are on "grandfathered" health plans) creates such an "underinclusiveness" which demonstrates that the Government will not be harmed in any significant way by the exclusion of these few Plaintiffs.

*Zubik*, 983 F.Supp.2d at 614.

During the course of the proceedings in the instant case, the Government did not present any evidence to illustrate how its harm "outweighs" the irreparable harm Plaintiffs would suffer absent an injunction.

Thus, this Court concludes that enjoining the Government from enforcing the contraceptive mandate against these few Plaintiffs cannot be as overwhelming a government interest in light of the millions of people who have been exempted from the entire ACA or large portions of the ACA (*i.e.,* Congress, the Territories, labor unions, etc.).

### 4.    Public Interest

To determine whether granting a permanent injunction is in the "public interest" (and thereby meet the final part of the permanent injunction test), this Court must ascertain whether greater injury will result from refusing rather than granting the relief requested.  *See Trefelner ex rel. Trefelner v. Burrell School Dist.,* 655 F.Supp.2d 581, 597-8 ("With regard to the public interest prong, the court finds that granting the temporary restraining order is in the public interest.  The focus of this prong is 'whether there are policy considerations that bear on whether the order should issue,'" citing 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE § 2948.4 (Civil 2d ed. 1995)).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *see also Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941).

This Court's "decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court," the "traditional principles of equity" demand a fair weighing of the factors listed above, taking into account the unique circumstances of each case.  *eBay*, 547

U.S. at 391, 394.  This Court recognizes the importance of considering the totality of circumstances bearing on whether a permanent injunction is appropriate equitable relief.

Turning to the instant matter, Plaintiffs in this case have requested that the Court grant them a permanent injunction, arguing that the ACA and the religious employer "accommodation," which requires them to facilitate/initiate compliance with the contraceptive mandate, violates their rights under the RFRA and the Free Exercise Clause of the First Amendment.

After careful consideration of this matter and drawing from the Court's experience in the two substantially similar matters – *Zubik* and *Persico*– containing identical issues presented for consideration, the Court concludes that it is not in the public interest to allow the Government to sever the Catholic Church into two parts (*i.e.*, worship and faith, and "good works") through the application of the "accommodation."  To do otherwise would enable the Government to restrict these Plaintiffs' right to the free exercise of religion as set forth in the First Amendment (and as further protected by the RFRA) to a "right to worship" only.  This reflective consideration as to nonprofit, religious affiliated/related entities, including Plaintiffs, is all the more in the public interest, because the Free Exercise of Religion is a fundamental right.

Moreover, this Court also concludes that public interest is best served if Plaintiffs (non-profit, affiliated/related organizations) can continue to provide needed educational and social services to the public-at-large.  As noted by Monsignor Riffle, one of the Plaintiffs, Catholic Charities, can take over 180 telephone calls per day "for food, for clothing, for diapers, for shelter, for fuel both for automobile and for home.  And our work in Catholic Charities is to find existing services that provide those assets to them or provide them ourselves through the works

of the Diocese."  Hearing transcript, doc. no. 40, pp. 66-67.  When asked to value those services

Catholic Charities provides to the public at large, Monsignor Riffle poignantly stated:

> It would be in the words of the one commercial, I think, priceless basically
> because how do you put a value on talking someone out of a suicide? How
> do you put a value on providing a young pregnant woman with a place to
> go and with options to be healthy herself and to keep her baby? How do
> you put a value on providing formula or diapers for an infant or housing in
> the middle of a cold winter storm? I don't know how you put a value on
> that. It is priceless.

Hearing transcript, doc. no. 40, pp. 67-68.

The Court finds that the public interest is also best served if Plaintiffs (non-profit,

affiliated/related organizations) can continue to provide needed educational and social services,

without the threat of substantial fines for non-compliance with the contraceptive mandate as

imposed upon them via the "accommodation."  Thus, as to the public interest, the Court views

this factor as unquestionably favoring injunctive relief in this case.


**VI.    Conclusion**

Based upon the foregoing Findings of Fact, Conclusions of Law, and cited legal

authority, the Court concludes that Plaintiffs have met their burden of proving all four criteria of

the permanent injunction test, and thus, Plaintiffs' request for a permanent injunction will be

GRANTED.

 s/  Arthur J. Schwab<br>
Arthur J. Schwab<br>
United States District Court Judge

cc:    All counsel of record